**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **Kristy Rae Gunther,** | ) | **CASE NO. 1:12CV0418** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE CHRISTOPHER A. BOYKO** |
| | ) | |
| **v.** | ) | **MAGISTRATE JUDGE GREG WHITE** |
| | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | **REPORT AND RECOMMENDATION** |

Plaintiff Kristy Rae Gunther ("Gunther") challenges the final decision of the
Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Gunther's claim
for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental
Security Income ("SSI") under Title II and Title XVI of the Social Security Act ("Act"), 42
U.S.C. §§ 416(i), 423, 1381 *et seq.*  This matter is before the Court pursuant to 42 U.S.C. §
405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the
Commissioner be vacated and the case remanded.

## I.  Procedural History

On January 21, 2009, Gunther filed an application for POD, DIB, and SSI alleging a
disability onset date of December 24, 2004[1] and claiming that she was disabled due to
depression, personality disorder, post-traumatic stress disorder ("PTSD"), and anxiety.  (Tr.
224.)  Her application was denied both initially and upon reconsideration.

On April 26, 2011, an Administrative Law Judge ("ALJ") held a hearing during which
Gunther, represented by counsel, and an impartial vocational expert ("VE") testified.  On May
25, 2011, the ALJ found Gunther was able to perform a significant number of jobs in the national
economy and, therefore, was not disabled.  The ALJ's decision became the final decision of the

---

[1]At the hearing, Gunther amended the onset date to July 29, 2008.  (Tr. 42.)

Commissioner when the Appeals Council denied further review.

## II. Evidence

### *Personal and Vocational Evidence*

Age 29 at the time of her alleged disability onset date, Gunther is a "younger" person under social security regulations.  *See* 20 C.F.R. §§ 404.1563 & 416.963.  (Tr. 28).  Gunther has a high school education and past relevant work as a retail cashier, mail sorter, and pharmacy delivery person.  *Id*.

### *Medical Evidence*

Gunther's psychiatric treatment began in 2004 (Tr. 330), but she worked until July, 2008. (Tr. 211.)  In November, 2008, because of symptoms of anxiety and depression, she was evaluated by Nancy Danielson, APRN, CNS[2], at The Nord Center.  (Tr. 497-501.)  Gunther was diagnosed with Bipolar Disorder NOS, PTSD, and Social Phobia.  (Tr. 500.)

On December 5, 2008, Gunther was hospitalized at The Nord Center's crisis unit based upon her suicidal ideation and hallucinations.  (Tr. 547-548.)  Upon intake, she appeared pleasant and cooperative, with no suicidal/homicidal ideations or hallucinations, and a good appetite.  (Tr. 546.)  Gunther rated her depression as a five on a scale of zero to ten.  *Id.*  She had a flat, blunted, depressed, and anxious mood with panic attacks.  (Tr. 636-639.)  She also exhibited a confused thought process and thoughts of worthlessness and helplessness.  *Id*. Gunther alleged prior hallucinations, but she remained alert/oriented, with fair eye contact, good attention, good recent and remote memory, and fair judgment.  *Id*.  She reported prior suicial ideation, but denied homicidal ideation.  *Id*.

The next day, an Individual Service Plan Goal Sheet was completed, identifying Gunther as needing assistance with her suicidal ideation.  (Tr. 502.)  She requested "[h]elp to determine a disability."  (Tr. 502.)  Her personal care plan noted that Gunther required some prompting/monitoring regarding her medications, but needed no help with social/recreational needs or activities of daily living.  (Tr. 503.)  The record reflects that she presented as depressed,

---

[2]APRN is Advanced Practice Registered Nurse.  CNS is Clinical Nurse Specialist.

2

but appeared alert and oriented with a "quiet calm" affect.  (Tr. 543.)

Amy Anderson, Ph.D., a Nord psychologist, interviewed Gunther on December 11, 2008, noting that Gunther felt that she was pressured and judged by her family for being unemployed. (Tr. 526.)  Gunther expressed that the Nord staff was her only support and she would like to get involved with vocational services.  *Id*.  Dr. Anderson noted that therapy would be useful in treating Gunther's anxiety and PTSD.  *Id.*

Between December 6, 2008, and her discharge date of December 16, 2008, the Nord staff noted that at times Gunther had trouble finishing thoughts (Tr. 539), or she exhibited loose, easily distracted, disorganized, or racing thoughts.  (Tr. 521, 534, 539).  Yet, at other times, her thoughts were clearer.  (Tr. 529.)  She was diagnosed as having major depression with psychosis and PTSD.  (Tr. 538.)  Celexa and Abilify were prescribed.  *Id*.

At follow-up visits through April of 2009, Gunther reported no suicidal/homicidal ideations.  (Tr. 465, 506, 508.)  As Gunther's goal was to obtain part-time employment, at monthly sessions a Nord counselor assisted Gunther in completing work applications (Tr. 453) and accompanied her to area stores to seek retail positions.  (Tr 446.)  The counselor reported that Gunther demonstrated strength in overcoming her anxiety and presented herself to employers with confidence.  *Id*.  Gunther was successful in obtaining a job, but quit after three days because she had trouble dealing with people and focusing.  (Tr. 53, 438.)

On May 21, 2009, Ronald G. Smith, Ph.D., a clinical psychologist, consultatively examined Gunther.  By letter dated June 9, 2009, Dr. Smith reported her to be cooperative with an appropriate affective expression and a good range of affect.  (Tr. 328-334.)  She denied suicidal/homicidal ideation or impulses.  (Tr. 331.)  She expressed fears of her step-father and the dark, and a preoccupation with household cleanliness.  (Tr. 331-332.)  She denied any hallucinations.  (Tr. 332.)  Dr. Smith further noted that Gunther appeared alert, oriented, and in good contact with reality, with fairly normal memory skills, fair insight, and good judgment.  *Id.* Dr. Smith opined that Gunther was moderately impaired in relating to others and in withstanding the stress and pressures of day-to-day work activity.  (Tr. 333-334.)  He further opined that Gunther had no impairments in understanding, remembering, and following instructions, or in

3

maintaining attention, concentration, and persistence in the performance of routine tasks.  (Tr. 333.)

On June 18, 2009, Todd Finnerty, Psy.D., a state agency psychologist, concluded that Gunther could comprehend, remember, and carry out simple tasks.  (Tr. 407.)  He further concluded that she could make simple decisions, maintain attention, adhere to a schedule, and relate adequately with others.  *Id.*  Dr. Finnerty noted that Gunther should have limited contact with the public and that she could not perform work involving either over-the-shoulder managing or constant contact with co-workers.  *Id.*  He also found that while Gunther needed to avoid positions with high production demands/quotas, she could adapt to settings with routine and predictable duties.  *Id.*

Dr. Finnerty completed a Psychiatric Review Technique form finding that Gunther's depression, social phobia, and personality disorder mildly restricted her activities of daily living, caused moderate difficulties in maintaining social functioning, concentration, persistence, or pace; and resulted in no episodes of decompensation.  (Tr. 408-418.)  Carl Tishler, Ph.D., another state agency psychologist, affirmed Dr. Finnerty's assessment on January 29, 2010.  (Tr. 473.)

On January 15, 2010, Dr. Anderson completed a Mental Status Questionnaire.  (Tr. 427-429.)  In answering the question as to how Gunther would react to the pressures involved in simple and routine or repetitive tasks, in work settings or elsewhere, Dr. Anderson responded that Gunther "becomes overwhelmed, fearful, she will cry then becomes anxious/flushed and headache."  (Tr. 428.)  Dr. Anderson further indicated that Gunther had "attempted job – lasted 3 days had felt anxious and overwhelmed with being around others and trying to work."  *Id.*  Dr. Anderson also completed a Daily Activities Questionnaire.  (Tr. 430-431.)  When asked to describe and give examples of anything that might prevent work activities, Dr. Anderson indicated "poor stress tolerance."   (Tr. 430.)

In September, 2010, Gunther was hospitalized at The Nord Center crisis unit for suicidal ideation.  (Tr. 704-705.)   She admitted that she had not been compliant with her medication since her last admission.  (Tr. 704.)  The records indicate that Gunther was observed to have a

4

flat affect, poor eye contact, and to be blocking at times.  (Tr. 702.)  The records also reflect that Gunther appeared cooperative, smiling, polite, courteous, and with decreased anxiety and depression.  (Tr. 700, 702.)  Gunther reported fair appetite and sleep, no current suicidal/homicidal ideation, and appropriate interaction with other residents.  *Id.*

On April, 21, 2011, Nurse Danielson completed a "Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment" under the supervision of Margaret Messerly, M.D.  Ms. Danielson found that Gunther had marked limitations in the ability to:

- maintain a reasonable pace;
- withstand the pressures of routine, simple unskilled work;
- make judgments that are commensurate with the functions of unskilled work, *i.e.*, make simple work-related decisions.

(Tr. 707-708.)  Ms. Danielson further noted that Gunther needed a job coach.  *Id*.  Dr. Messerly signed off on the statement as supervising doctor on May 2, 2011.  *Id.*

### Hearing Testimony

At the hearing, Gunther testified to the following:

- She lives with a friend she met while hospitalized in 2008 at The Nord Center.  (Tr. 44.)

- She is unable to work due to her mental/emotional problems, which also leads to physical ailments such as headaches and stomach/back pain.  (Tr. 45.)

- She has experienced depression since approximately age twelve.  *Id*.  Her symptoms include crying, not being able to think clearly, trouble concentrating and focusing, especially when a lot of people are around.  (Tr. 45-46.)

- Currently, she takes Zoloft and Vistaril, which helps her symptoms except for the anxiety.  (Tr. 46.)

- In the last ten years, Gunther's anxiety issues have increased.  *Id*. Working in retail or any position with "time pressure crunches" or stress worsens her anxiety level.  *Id*.

- At The Nord Center, she was treated by Nurse Danielson and Psychologist Dr. Anderson.  (Tr. 48.)

- At the positions she held prior to 2008, she would cry on the job and did not want to associate with coworkers or be in the public.  (Tr. 49.)

- Recently, she attempted to work at an aquarium, but it lasted about a week

5

due to the fact that she had difficulty performing some tasks and dealing with the public. (Tr. 52-53.)

• A job at JoAnn Fabrics lasted three days because she had limited orientation and training before she began working on her own. (Tr. 52-53.) She also had difficulty with customers because she was not able to answer their questions. (Tr. 53-54.)

• At JoAnn Fabrics, Gunther would lose her concentration about five to ten times each day. (Tr. 54.)

After the VE described Gunther's past work, the ALJ posed the following hypothetical:

Let's assume we've got a hypothetical person who has no particular exertional limitations, the person is able to understand, remember, and carry out simple instructions, able to make simple work-related decisions, let's also say that this person should not be required to interact with the general public, the person is unable to tolerate close supervision, she's able to tolerate occasional contact with coworkers, she's able to tolerate a setting in which duties are routine and predictable, she should avoid jobs requiring adherence to strict high production demands and quotas, she would function best working with small groups of familiar coworkers or by herself. Now, based upon these limitations would the hypothetical person be able to perform any of Ms. Gunther's past work?

(Tr. 58.) The VE testified that this hypothetical person would not be able to perform Gunther's past work, but would be able to perform as a laundry laborer (300 jobs locally), a dishwasher (2,000 jobs locally), a housekeeper/cleaner (2,000 jobs locally), or a mail clerk (800 jobs locally). (Tr. 58-59.) The VE explained that the mail clerk position was described as simple, routine as compared to the previous mail sorter job Gunther held, which was semi-skilled. (Tr. 59.)

The ALJ posed a second hypothetical as follows:

Let's assume that we have a hypothetical person who would be expected to be off task at least 15 to 20 percent of the time on a consistent basis. How would that affect the occupational base, please?

(Tr. 59-60.) The VE testified that at fifteen percent off-task on an on-going basis, no jobs would be available. (Tr. 60.)

Counsel questioned the VE regarding his selection of the four occupations and how the VE interpreted the limitations in the first hypothetical question. (Tr. 60-79.) Additionally, upon counsel's request for the exact source for the local jobs numbers, the VE testified that they were taken from Occupational Employment Quarterly and that he was willing to locate the information on his computer. (Tr. 73-73; 77-80.) The ALJ, however, claiming time constraints

6

and that the information did not appear to be probative, directed that if counsel wanted the exact source of the local jobs numbers to be a part of the record, he should request the same electronically.  (Tr. 79.)  On May 1, 2011, in a letter to the ALJ, Gunther's counsel challenged the VE's testimony and requested "to see a copy of the original data relied upon by the VE." (Tr. 286-290) (Doc. No. 14 at 5.)  The very next page of the record contains an undated report in which the VE provided to the ALJ the following data regarding local jobs:

| | |
|---|---|
| Hskg clnr | 2,057 |
| Mail clerk | 499 |
| Laundry laborer | 757 |
| Dishwasher | 1,803 |

(Tr. 291.)[3]  The VE indicated that these job estimates were from the Occupational Employment Quarterly II, 2nd quarter, 2009.  *Id.*  Although the ALJ relied upon the original jobs numbers provided by the VE at the hearing, the Appeals Council included the second data report in the record.  (Tr. 291.)

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[4]

_____

[3]It is not clear who, if anyone, requested that the record be supplemented with this information.  The report itself suggests it was done in response to a request made at the hearing on April 26, 2011.

[4]The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity."  Second, the claimant must suffer from a "severe impairment."  A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d).  Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled.  For the fifth and

7

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Gunther was insured on her alleged disability onset date, July 29, 2008, and remained insured through the date of the ALJ's decision, May 25, 2011.  (Tr. 19.)  Therefore, in order to be entitled to POD and DIB, Gunther must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

A claimant may also be entitled to receive SSI benefits when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

### IV.  Summary of Commissioner's Decision

The ALJ found Gunther established a medically determinable, severe impairment, due to major depressive disorder, post-traumatic stress disorder/social anxiety, and personality disorder; however, her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  Gunther was found incapable of performing her past work activities, but was determined to have a Residual Functional Capacity ("RFC") for the full range of work at all exertional levels with some nonexertional restrictions.  The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Gunther was not disabled.

### V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied.

---

final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

*See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.  *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with a sufficient basis to determine that the Commissioner applied the correct legal standards are grounds for reversal where such failure prejudices a claimant on the merits or deprives a claimant of a substantial right.  *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272 (6th  Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006).

## VI.  Analysis

### Dr. Anderson's Opinion

Gunther contends that when formulating the RFC, the ALJ did not reasonably account for

9

Dr. Anderson's opinion that Gunther had a "poor stress tolerance" and a diminished capacity to tolerate even simple routine work because she would become fearful, overwhelmed, anxious, and would cry often.  (Doc. No. 14 at 8-9.)  Gunther also asserts that because the ALJ claimed that Dr. Anderson's opinion supported the RFC when it did not, the ALJ should have explained his reasons for rejecting parts of the opinion.  *See* 20 CFR §§ 404.1527(d)(2) & 416.927(d)(2).

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Meece v. Barnhart*, 192 F. App'x 456, 560 (6th Cir. 2006) (*quoting* 20 C.F.R. § 404.1527(d)(2)).  "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 192 Fed. App'x at 460-61 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.)  Furthermore, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[5]

Nonetheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406 ("It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory

---

[5]  Pursuant to 20 C.F.R. § 404.1527(d)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

10

diagnostic techniques or if it is inconsistent with other substantial evidence in the case record.")
(*quoting* SSR 96-2p).  Moreover, the ALJ is not bound by conclusory statements of a treating
physician that a claimant is disabled, but may reject such determinations when good reasons are
identified for not accepting them.  *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v.
Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745
F.2d 383, 391 (6th Cir.1984).  According to 20 C.F.R. § 404.1527(e)(1), the Social Security
Commissioner makes the determination whether a claimant meets the statutory definition of
disability.  This necessarily includes a review of all the medical findings and other evidence that
support a medical source's statement that one is disabled.  "A statement by a medical source that
you are 'disabled' or 'unable to work' does not mean that we will determine that you are
disabled."  *Id*.  It is the Commissioner who must make the final decision on the ultimate issue of
disability.  *Duncan*, 801 F.2d at 855;  *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985);
*Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

The ALJ addressed Dr. Anderson's opinion as follows:

> Finally, the undersigned has also considered the opinion of the claimant's treating
> psychologist Amy Anderson, Ph.D.  In her January 2010 medical source
> statement, Dr. Anderson stated the claimant has "some difficulty" with
> remembering, understanding, and following directions; has anxiety around others
> in public; can become distracted; and becomes agitated for a while following
> change.  Dr. Anderson also noted the claimant can become overwhelmed and
> anxious in dealing with work pressures.  (Exhibit 10F/6.)  This opinion was
> rendered when the claimant was non-compliant with medications, and it appears
> her symptoms have improved significantly since that time.  As such, this opinion
> is given only moderate weight.  However, the limitations noted by Dr. Anderson
> are consistent with the residual functional capacity assessment above.  For
> example, due to difficulty with remembering, understanding, and following
> directions, the claimant is limited to following simple instructions and making
> simple, work-related decisions.  Further, because of her anxiety around others, the
> claimant is limited to only occasional, superficial contact with the public, with
> some further limitations regarding co-workers and supervisors.  Additionally,
> because of her agitation when dealing with change and trouble dealing with work
> stress, the claimant is limited to job duties that are routine and predictable and do
> not have strict, high-production demands and quotas.

> * * *

> The record contains no other opinions as to the claimant's mental limitations
> rendered during the relevant period.

(Tr. 27.)  The ALJ formulated the RFC as follows:

11

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is able to understand, remember, and carry out simple instructions.  She is also able to make simple, work-related decisions.  Further, the claimant is able to tolerate occasional, superficial contact with the general public but is unable to tolerate close supervision.  The claimant can also tolerate occasional contact with coworkers and a setting with routine and predictable duties.  The claimant should avoid jobs requiring adherence to strict, high production demands and quotas.

(Tr. 24.)  The ALJ explained that he gave Dr. Anderson's opinion moderate weight because it was made when Gunther was non-compliant with medications.  The ALJ further explained that after her hospitalization in September, 2010, when Gunther was compliant, her symptoms were relatively well-controlled.  (Tr. 26.)  The ALJ relied upon medical evidence to find that Gunther's symptoms appeared to substantially improve with the use of medications and that her daily activities were not as limited as expected, given her complaints:

> For example, in December of 2008, the claimant was less anxious and more articulate with the use of medications.  (Exhibit 13F/77.)  In November of 2010, the claimant also reported her medications were working well, and she was experiencing less depression, less anxiety, and fewer mood swings.  (Exhibit 20F/29.)  Further, in December 2010, the claimant stated her symptoms had continued to improve, and providers described the claimant as talkative, calm, and able to stay focused.  (Exhibit 20F/25.)  At hearing, the claimant also confirmed her medications are helpful in lessening her symptoms.  (Hearing Testimony.)
>
> * * *
>
> The claimant has described daily activities that are not limited to the extent one would expect, given her allegations of disabling symptoms and limitations.  For example, the claimant is able to perform household chores such as cleaning, cooking, shopping, and laundry without difficulty.  She is also able to drive and can go out alone.  (Exhibit 4E.)  The record also indicates the claimant is able to participate in a computer class twice each week, attend religious services regularly, and visit with friends.  (Exhibit 20F.)  She is also able to participate in volunteer activities, such as teaching at a Bible camp and volunteering at her counseling center.  (Exhibits 1F/8, 10F/16.)

(Tr. 26.)

The ALJ sufficiently explained the reasons for assigning Dr. Anderson's opinion only moderate weight.  Under 20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2), a treating physician's opinion is entitled to controlling weight only if it "is not inconsistent with the other substantial evidence in [the] case record."  Nonetheless, as Gunther contends, there is a conflict between the ALJ's decision and the RFC determination.  (Doc. Nos. 14 at 8-9, 16 at 7.)  While the ALJ

12

professed to give it only moderate weight, he also declared that Dr. Anderson's opinion of January 15, 2010, was consistent with the RFC. Dr. Anderson's opinion was that Gunther had a diminished ability to tolerate the stress of even simple, routine work. The RFC allowed that Gunther was able to understand, remember, and carry out simple instructions and make simple, work-related decisions. It seems, therefore, that Dr. Anderson's opinion and the RFC are not consistent. The ALJ's claim otherwise would seem to raise doubt as to the reasoning attached to the RFC.

### Medical Source Statement

Gunther contends that the ALJ ignored a medical source statement signed by Nurse Danielson and Dr. Messerly, both treating sources, indicating that she has marked limitations in three areas. (Tr. 707-708.) The Commissioner asserts that the ALJ considered all the opinions, but even if this specific medical statement was overlooked, it was harmless error as it was made by a nurse, not a physician, it was not supported by medical signs or laboratory findings, and it was inconsistent with other evidence. (Doc. No. 15 at 14-16.)

The medical source statement at issue was completed and signed by Nurse Danielson on April 21, 2011, just five days before the April 26, 2011 hearing date. On May 2, 2011, Dr. Messerly signed off as the supervising physician. On May 24, 2011, Gunther submitted the fully executed document to the ALJ. Gunther concedes that this medical statement was sent to the ALJ one day before the ALJ's decision was issued, but contends that it was part of the record and should have been considered. (Doc. No. 14 at 6-7.) It is undisputed that the ALJ acknowledged that this statement was part of the record he considered when issuing his decision. Indeed, it was referenced in the List of Exhibits attached to the decision. (Tr. 35.) Nonetheless, the ALJ did not address the medical source statement. To the contrary, the ALJ noted that after Dr. Anderson's January, 2010 Mental Status/Daily Activities Questionnaires, "[t]he record contains no other opinions as to the claimant's mental limitations rendered during the relevant period." (Tr. 27.) This last statement was used by the ALJ as justification for the weight assigned Dr. Anderson's opinion. The ALJ specifically maintained that Gunther's condition improved after January, 2010. The report, if credited, would rebut that conclusion.

13

SSR 96-5p discusses the evaluation of medical source statements on issues reserved to the Commissioner.  Medical source statements are reports submitted by acceptable medical sources.  Acceptable medical sources include licensed physicians and licensed or certified psychologists.  20 C.F.R. §§ 404.1513(a)(1) & (2); 416.913(a)(1) & (2).  Medical reports include "(1) Medical history; (2) Clinical findings (such as the results of physical or mental status examinations); (3) Laboratory findings (such as blood pressure, x-rays); (4) Diagnosis (statement of disease or injury based on its signs and symptoms); (5) Treatment prescribed with response, and prognosis; and (6) A statement about what [a claimant] can still do despite [her] impairment(s) based on the acceptable medical source's findings on the factors under paragraphs (b)(1) through (b)(5) of this section."  20 C.F.R. §§ 404.1513(b) & 416.913(b).

Nurse practitioners are not acceptable medical sources.  20 C.F.R. §§ 404.1513(d)(1) & 416.913(d)(1).  Nonetheless, opinions from any medical source on issues reserved to the Commissioner must never be ignored.  20 CFR §§ 404.1527(d) & 416.927(d); SSR 96-5p at * 3.  The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner.  *Id.*

Gunther refers to Dr. Messerly as her treating psychiatrist (Doc. No. 16 at 4), but does not direct the Court to any of the psychiatrist's treating records.  The Commissioner contends that Gunther erred by attributing this statement to Dr. Messerly as it was Nurse Danielson who completed the statement while under Dr. Messerly's supervision.  The Commissioner does not, however, challenge the claim that Dr. Messerly was a treating psychiatrist.  The ALJ was required to consider the medical source statement.  20 C.F.R. §§ 404.1527(d) & 416.927(d) ("Regardless of its source, we will evaluate every medical opinion we receive.")  As such, the ALJ should have addressed Nurse Danielson/Dr. Messerly's medical source statement.  This is especially true given the weight assigned to Dr. Anderson's opinion and the ALJ's claim that no other opinions existed.

The relevant opinion in April, 2011, asserts that Gunther was markedly limited in four areas of work activities.  The ALJ was required to address this medical source statement,

14

especially in conjunction with Dr. Anderson's opinion that Gunther had a poor stress tolerance and diminished ability to perform simple, routine repetitive tasks.  "[A court] cannot uphold a decision by an administrative agency ... if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).  Under some circumstances, it may be acceptable not to review every medical opinion, *see Woldt v. Astrue*, 2011 WL 1792793, *11 (N.D. Ohio May 11, 2011), but specifically denying the existence of the report in question here renders the weight assigned to Dr. Anderson's opinion and the RFC assessment in question.  Because the ALJ did not provide an analysis that is sufficiently specific, Gunther's argument that the ALJ failed to properly assess the treating medical opinions is well-taken.

**VE's Testimony**

Gunther next contends that the ALJ's decision at the fifth step of the procedure was erroneous for several reasons:

(1) The ALJ relied upon the VE's testimony that misstated the job-incidence data.  (Doc. No. 14 at 9-10);

(2) The ALJ violated her due process rights when he denied her request for the jobs data and when the ALJ arbitrarily limited counsel's questioning at the hearing.  *Id*. at 10-13;

(3) The ALJ ignored a result-determinative issue regarding Gunther's ability to remain on-task.  *Id*. at 13-14; and,

(4) The ALJ reviewed the VE's written data-incidence report, but did not offer it to Gunther or counsel.  (Doc. No. 16 at 1-3.)

Having found remand is necessary due to the ALJ's insufficient analysis regarding treating medical opinions, the Court need not consider Gunther's arguments regarding the VE's testimony.

Gunther can be awarded benefits only if proof of her disability is "compelling."  *Facer v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and award benefits only if all essential factual issues have been

15

resolved and proof of disability is compelling).  When the ALJ misapplies the regulations or when there is not substantial evidence to support one of the ALJ's factual findings and his decision therefore must be reversed, the appropriate remedy is not to award benefits.  The Court, therefore, concludes that remand is required under "sentence four" of 42 U.S.C. § 405(g).[6]

### VII.  Decision

For the foregoing reasons, the Court finds the decision of the Commissioner not supported by substantial evidence.  Accordingly, the decision of the Commissioner should be vacated and the case remanded, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation.


s/ Greg White
United States Magistrate Judge

Date:    November 28, 2012


### OBJECTIONS
**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

---

[6]Under sentence four of 42 U.S.C. § 405(g), the district court has the authority to reverse, modify, or affirm the decision of the Commissioner.  This may include a remand of the case back to the Commissioner for further analysis and a new decision.  A sentence four remand is a final judgment. *See Melkonyan v. Sullivan*, 501 U.S. 89, 97-102, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991).